and our first case of the day is Ellison v. American Board of Orthopaedic Surgery, number 20-1776. We're glad you can join us via Zoom. We wish we could see you in person, but of course that's not possible just right yet, and we're glad to see you though via Zoom. The same rules apply though. We're going to do 15 minutes a side, and if the appellant wants to reserve a little bit of time, that'd be great. We'll hear his request and grant it or not, probably grant it, but I'll keep time. I suggest you do so as well, and without further ado, why don't we move forward. So, for appellant, would you like to reserve some time? Yes, Judge Chigares, I'd like to reserve five minutes for rebuttal. Okay, that'll be granted, and you may proceed whenever you're comfortable. Thank you, and may it please the court. My name is Andrew Schlafly. I represent Plaintiff Appellant Bruce Ellison. We're appealing from a Rule 12b-6 dismissal of our challenge to restraint of trade by Defendant American Board of Orthopedic Surgery, which I'll abbreviate as ABOS. ABOS is a business. It's a monopoly. Despite its name as a board, it's not part of the government. It's simply a private monopoly that is restraining trade to the detriment of Bruce Ellison, other physicians, and most importantly, the patients who are then denied access to their services. Can we just... Go ahead, Tony. No, you go ahead. Let's jump to standing, if we could. I'm wondering how your client has standing when it seems admitted that he'd never applied to take the Step 2. He said they would say no to me, but usually in these cases, we make people actually do something and get refused, not just say, I'm pretty sure they'd say no. So why do you have standing to make this complaint when he didn't take the steps that would even allow the board to say whether or not they'd let him take the test? Thank you, Judge Jordan. My client, Bruce Ellison, did take the steps in order to get the board certification. So he did pass Part 1 of the exam offered by ABOS, and then he was denied, expressly denied, it's in the last page of the appendix, the ability to sit for Part 2 of the exam by defendant ABOS. But he didn't apply for privileges, right? I mean, that's the point. He didn't... He says, I'm in a Catch-22 because they won't let me take this test, but he doesn't apply for the privileges that would allow him to take the test. He says, I'm pretty sure they would tell me no if I applied for privileges. How can he say that and claim he's in a Catch-22? Why doesn't he just apply for the privileges and see what happens? It's an excellent question, Judge Jordan. And the reason is because the hospitals expressly state that they will not grant privileges to someone unless the applicant has board certification. So for him to apply, it would be an case, right? Or otherwise everybody would be caught in this Catch-22. Nobody would be able to get through that the way you've described it. The fact is there is an opportunity for him to apply to get the privileges and to take the test. He's like, he's not out to get Bruce Ellison. He's like everybody else. He's got an opportunity, he just won't take it. Why won't he take it? In the medical profession and as the rules expressly state, there's a window of time after a surgeon completes his residency program in which hospitals will grant privileges to someone who has recently completed the residency program and who promises to get the board certification. But that's a short period of time, which Bruce Ellison has now passed. So most physicians are able to get the hospital privileges by applying within this period of time after they complete their residency program. And that's why this Catch-22 does not apply to most physicians, but it does apply to some. It does exclude some physicians, some, you know, highly skilled physicians with unique abilities, as in case Bruce Ellison, here's a fellow who's successfully operated on Willie Mays, a surgeon, and these physicians are blocked from getting into the market. Isn't he also required to have applied for a license in New Jersey? Don't the hospitals require that you be licensed in New Jersey in order to get hospital staff privileges? And maybe I'm wrong, but I think he has not applied. That's right, Judge Sirica. And that is generally a ministerial requirement. In other words, once a physician seeks to get hospital privileges in a particular jurisdiction, he has a license in California. Yeah, but that's not in New Jersey. That's right. But it's generally a ministerial obstacle like reciprocity and getting a legal license. Counsel, you can see where we're going here. You know, it seems all aspirational. Is there real standing here? He's got good intentions in a lot of them. But is that enough to take you into the fairly rigorous Article III realm? Well, Your Honor, this, I mean, of course, the court has an obligation to examine its own jurisdiction. There's no doubt about that. This was not the basis of the ruling below. The ruling, the decision we're appealing did not deny us relief on this basis. Well, that's true. But we always have an obligation to deal with Article III standing, no matter what happens in the district court, right? So we have to, whether any of us want to do it or not, we got to come to grips with the fact that he didn't apply for a license. He didn't apply for admitting privileges. He didn't do either of those things that he would have to do. And yet you're coming here saying, just don't worry about that. We've got a real problem here, Catch-22. So that's the problem we've got to face, and you got to help us face it. Right, Your Honor. And it's not because we're trying to pull a trick or anything. It's because the steps that you describe are ministerial steps by which Bruce Ellison would automatically get denied. And here's the problem in the medical profession. We don't have this in the legal profession. But the medical profession, when someone is denied hospital privileges, or someone's denied an application for a medical license, that then triggers an entry into the National Practitioner Data Bank. And all doctors know this. And then what happens is you've got this demerit in the National Practitioner Data Bank, which then hurts your career. So when the rules are so expressed that, listen, the hospital's saying, we're not going to grant you privileges unless you're board certified. I mean, they say that, right? It's on the internet. They're up front. Don't even apply unless you're board certified at this level of experience of the physician. Again, if you're right out of a residency program, you can do it. So you're asserting that there's no conditional admission privilege. If somebody comes and says, we're ready. I'm ready to take step two. But I have to have an admission that the hospital has said to him, don't do it. Don't do it because we won't let you. You're saying he approached the hospital and they said, we won't let you do it. He did. He contacted hospitals to find out what their rules are. Where is that in the record? That he contacted a hospital and they said, don't do it. Well, it's on a 12 B six motion. So unfortunately we're not able to develop a record in this case that would have deposed him. And where is it in the complaint? Where is it in the complaint that he approached the hospital and they said, don't do it. What he did was I have to look at the complaint and see exactly what it says. But the complaint says in many paragraphs that this hospital prohibits it. This hospital prohibits it. And it's expressed. It's not, we're not making this up. I mean, it's express a check, double checked it on the internet last night. These are the rules and they are absolute. There are no exceptions to these rules. When you're saying the rules, are you talking about the hospital bylaws? They are usually part of the bylaws, your honor. That's correct. But where else are these rules? Where else are they? Yes. They're regulations of the hospital. They, they, each hospital will describe it a little bit differently, but it's, it's conditions on applications. I mean, and, and it's, they make it available because they don't want applications from people. They're just going to reject. So they're, they're, I'm sorry, go ahead. The bylaws that were referenced in your complaint, the link that you provided, say that there has to be, you have to have a license in order to gain entry. You do. And again, that's just a ministerial thing. It's like reciprocity in the legal profession. I mean, if you get a job from a law firm in another state that requires a career. No, it hasn't your honor, because if he gets rejected, it hurts his career and the rejections automatic. I mean, it's like, why'd you even apply? You know, the rules. I mean, it's the rules are so clear that to apply would be would cast doubt on what this person is doing. I mean, the rules are clear. And then, so then he gets rejected. I'm referring to the Yes, your honor. He could apply for a license, but he has no place to work. I mean, there's no place that he, the, and again, this lawsuit is against ABOS. It's not against the hospitals. It's not against a medical board. It's against ABOS, which expressly refused to allow him to sit for part two of the exam after he had passed part one, which was a more difficult part. It sit for part two of the exam. And that's the, the condition that we're objecting. We're not suing hospitals here. We're not suing the medical board here. Right. Could you, could you please tell us what the agreement is of the conspiracy between a ABOS and, and the hospitals you say? Yes, your honor. They do this. The only agreement that I saw, you know, with the American medical services, board of medical services and the hospitals, and that was an MOC, a re-evaluation and a re-licensing. I didn't see anything for the initial, any agreements that referred to the initial decision. Your honor, ABOS does this through its trade association, ABMS, which works out these agreements with the trade association for the hospital AHA. So the agreements are between ABMS and AHA of which ABOS is a part. And the condition by which ABOS requires hospital privileges, they don't accept ambulatory surgery center privileges, which Bruce Ellison has had. They accept only hospital privileges and ABOS started applying this arbitrary condition. And at about the same time, hospitals started applying this arbitrary condition of requiring board certification by ABOS, not by other board certifying groups. So these two entities are reciprocating to each other and they started doing it about the same time. Their public statements about pressure being applied by the specialty societies to hospitals to require this arbitrary condition. There's an agreement that's in the complaint that you mentioned your honor about MOC. They're making money off of this. And so where's, and I don't want to be obtuse, but where's the agreement? Where's the agreement between ABMS and the hospitals that's, I mean, antitrust injury and an allegation of antitrust conspiracy requires more than just sort of a conclusory allegation that they're in it together. You got to say something more than that, right? So what's the more than that that's in your complaint? Yes. I mean, we've read the conclusory stuff. What's in there that's factual? The factual stuff is that both of them started doing this about the same time. There's public statements that pressure was being applied by the specialty societies to hospitals to require board certification by the specialty size, not by their competitors, but by these specialty sizes, public statement that I quote in the complaint that they were applying pressure on hospitals to apply this condition for their benefit. There's a public statement of the agreement. You're talking about this pressure. I mean, isn't that type of conduct just as consistent with the type of totally legal advertisement that all businesses engage in? Your Honor, pressure is something that's improper in the antitrust context. I mean, if we learned that Microsoft was pressuring a company to do something, that would raise off alarm bells. And we're dealing with a monopoly here as well. I mean, ABOS is a monopoly, nobody disputes that. And if the monopolist is pressuring an entity to do something for its benefit, I mean, the board certification required by hospitals is not board certification by multiple entities. It's board certification by ABOS, a monopolist. And if the monopolist is pressuring- If what you characterize as pressure is, hospitals saying, we do want some kind of certification and we've chosen to outsource that to ABOS. Is your assertion that the hospitals have to do this themselves? They have to do a certification study themselves because if they let somebody else do it, it constitutes conspiracy? It doesn't necessarily constitute conspiracy. Then what makes it conspiracy here? If they say, ABOS has got a certification program, we want a certification, we're going to outsource, we're going to let them do it. What from that set of facts would lead to the legal conclusion, conspiracy? Because, well, a couple of points there, Your Honor. First of all, I'm not saying we win the case. All I'm saying is we should have a right to discovery to find out what the facts are. And if facts are as you state, Your Honor- Well, I'm not stating them. I'm just asking you. I'm asking you what the facts are. Well, and when we allege a complaint, we go on whatever we can get from public sources. Now, if you've got a sophisticated monopolist, they're not going to put an agreement out there on the internet. They're not going to show all their cards. I mean, we're at the initial stage of the litigation. I mean, Bill Gates in his litigation, you know, he didn't lay it all out there to the public. He had to be deposed and there had to be a little digging to find out what the facts are. And I agree, Your Honor, if the facts are that hospitals sat down and said, we want board certification. And by the way, board certification has been widely criticized. So it's an assumption here that board certification is a good thing. I mean, I put in my reply brief, I quote from esteemed experts criticized- But that you'd have to acknowledge that that's neither here nor there for our purposes today, right? We're not getting into whether certification is a good idea or a bad idea. We were ill suited to second guess the medical profession on that. We're asking two things. First, does your client have standing? And second, assuming that they're standing, has there been a sufficient pleading of an agreement to violate section one of the Sherman Act? We've burned your time a lot on the first piece of that and spent a little bit here on the second. But if we can't get past those, that really didn't make any difference whether certification is a great idea or maybe bad policy, does it? Well, as long as we accept that certification may be completely arbitrary. I mean, it may be board certification. So here's a hospital, here are hospitals that lockstep require certification by only ABOS. They don't accept it from anybody else. There are other groups that offer board certification, but these hospitals require only by ABOS. Now, is it possible that ABOS just benefits from this windfall and had nothing to do with it? It's possible, but in the real world, if someone's going to require our product and there are other plus factors under Twombly, there are other plus factors here. So at the same time, ABOS is requiring hospital privileges in order to get his board certification. It's shutting down ambulatory surgery center. What would motivate the hospitals to do this? You've spent a lot of time talking about the economic interests of ABOS, but what's in it for the AHA? What's in it for these hospitals in Northern Jersey? How do they benefit from this conspiracy? In a couple of ways. First of all, they're publicly announced money-making programs between these hospitals through the AHA and the specialty societies. It was publicly announced. I put in the complaint. I mean, they're making money off of these programs. The hospital has to perpetuate this certification. They're making money off of it, number one, and that's in the complaint. So is this required under New Jersey regulations or law that there be continual recertifications? Absolutely not. The state medics, and this is another point of clarification. I really want to say state medical boards do not authorize this, require it. Absolutely not. This is pure business. This is pure people making money off of this. That's all it is. The state medical board does not require certification to get a license, does not tell people to do this. No, I'm talking about recertification. Same thing. Same thing, your honor. There's no state requirement of recertification. There are doctors that are denied. We get several cases of doctors whose privileges have been terminated for various reasons. So who does that? Those termination of privileges are done by the state. It's a tragedy every time it happens. It's not the state in any way. We've seen cases where the medical personnel just can't perform the function. And your honor, that's certainly appropriate. If the medical personnel cannot perform a function, then the hospital should take action to protect the patients. That's not what we have here. How do we know? When you say they can't perform the function, your argument is that the certification program itself is representative of a conspiracy, that it is representative of a self-interested act between hospitals and the specialty organization. I think the question that's being put to you is, how is the public protected? How is the state got its interest in protecting the public satisfied? And how does a hospital have its interest in liability protection handled, if not by some sort of a screening mechanism, a certification program? How can the certification program, which is to ostensibly, at least to protect the public, be a conspiracy when there's an interest in protecting the public from unqualified physicians? Well, Judge Jordan, that question gets to the point of whether board certification is a good thing. And I'm telling you, it's widely criticized. It's widely criticized to accomplish that goal, which is a worthy goal, to accomplish it in this proprietary manner. Realize that Bruce Ellison has an exemplary surgical record at ambulatory surgery centers. Well, we've stayed away from your, I've stayed away from your client's record. I mean, it appears in the record, at least the other side seems to indicate that the reason he doesn't want to apply for hospital privileges is because he's going to get it refused because he had his privileges revoked in California. He doesn't have an exemplary record. He's got a less than coming from the other side here is that there's a reason he's not trying. And the reason doesn't have anything to do with conspiracy. It has to do with his own background. Now, clearly, that's not something you'd agree with. And you put stuff in your complaint about, and in your briefing about his record, but is it significant? Is it something we should be taking into account that he had privileges revoked in California and that that might explain why he's not taking the steps to get privileges? Your honor, I have to object to that. I mean, it's, this is a rule 12 B six motion on Bruce Ellison's complaint for the other side to go outside that record and throw mud at the wall that it is hearsay that we don't have an opportunity to defend. We've not been allowed to develop a factual record. We welcome discovery. We welcome them deposing Bruce Ellison, but for them to sling mud without getting into a development of a factual record, I strenuously object to that. And that's not why he hasn't applied for privileges here. And it's, um, his record is exemplary. None of that should be considered by the court. The other side should not have argued it on a rule 12 B six motion. Uh, this is on the complaint. We are being blocked at the, the outset of a case from getting into development of a factual record. If the facts come out as your honor suggests that this is all perfectly innocent and hospitals are trying to protect the public, then we lose the case. That's fine. But we've been denied the ability to develop that factual record. And we we've got a monopolist here that's making money and it's doing it in a way, which is a fairly recent, just in the last 10 years and other specialty sites don't do this. Okay. I got you. I got you. You're a way over time. Um, we, we, uh, took a lot of your time on standing and, and, uh, so, uh, uh, unless do my colleagues have any other questions because otherwise we'll hear you on rebuttal. Judge Jordan, you're good. Yep. Okay. All right. Thank you. We'll, we'll hear you on rebuttal. Uh, Mr. Green, we'll hear from you now and we'll give you extra time if you need it. Good morning. And may it please the court, Daniel green, a better price for the defendant, happily, the American board of orthopedic surgery. We agree with the court that there is a fundamental standing difficulty here. Um, Mr. Schlafly has suggested that obtaining New Jersey medical licensure is a purely ministerial process. Um, but that doesn't explain why his client hasn't taken the necessary steps to do so. And well, Mr. Green, why don't you, why don't you go first? You know, we're not suggesting anything. We're asking questions. So, uh, why don't you go straight to the point that Mr. Schlafly was hitting, which is, uh, as, as to applying to take step two, uh, people like his client who are outside the newly graduated, newly minted doctor set, uh, they, they can't, uh, get, uh, uh, a conditional or, uh, uh, a provisional admission. And therefore they are in a catch 22. What's your response to that? Completely inaccurate. And we don't have to go outside the complaint or speculate about that point because in an earlier iteration of the complaint, Mr. Schlafly acknowledged that many hospitals provide privileges to physicians who are board eligible board eligible is somebody who has passed a part one exam and is then practicing and building the caseload necessary to qualify for a part two exam. Uh, and that was a status that Mr. Dr. Ellison possessed until relatively recently, and which she could regain by retaking the board's part one exam. There are some assertions in the complaint and in Mr. Schlafly's briefing that my client only allows surgeons who have completed their residency within some specified period of time to sit for the one exam. That's not true. Uh, those assertions are not, are not cited supported by citations to any portion of my client's policy. And that policy was relied upon by Mr. Schlafly and drafting the complaint. So it's properly before the court. And it's very clear on the face of the policy that a surgeon can take the part one exam at any point in his or her career and can retake it as many times as necessary in order to achieve board eligibility. So to make, to be perfectly clear here, the position you've taken is, uh, Dr. Ellison had five years within which he could have applied for conditional or provisional privileges. And that those, uh, and because he was within that window, even though he was not a recent medical school graduate, uh, he would have been permitted to, uh, he would not have been refused as a matter of course, as Mr. Schlafly is asserting would have been the case. That's, that's what you're saying. And you're saying that that could be understood from the face of the complaints. Your Honor, that admission is contained within the second iteration of the complaint. It was removed from the final amendment of the complaint, but the concession was paid in one iteration of the complaint. And, and that is you have accurately encapsulated our position. And once more, he could take the exam again at the next administration and again, become board eligible. Well, of course he complains that, that he's unable to complete the certification exam. I just, just, could you just make clear what exactly your argument has been with respect to this, his complaint? I can't take the second part. Is it that he can take the first part, get a provisional and then take the second part? He, so he did previously take the first part and he became board eligible at that point, but he didn't fulfill all of the requirements for sitting for the second part. One of which is having possessed hospital privileges for a specified period of time. And there are various reasons why my client has that policy, but we have avoided basing our arguments on those reasons because they're outside of the current record. But to sum it up, he could become board eligible again. He has acknowledged that there are hospitals that will employ a physician who is board eligible, but not yet board certified. And were he to obtain employment at one of those hospitals, he would then be eligible to sit for part two of our exam. So is it fair to say you disagree with your friend's characterization of this situation as a catch-22? That's correct. And if it were, as he describes it, it would be difficult to impossible for any orthopedic surgeon ever to obtain board certification or employment. It's not. And our policies were no impediment to him obtaining hospital privileges in the first instance. He did once have them. Could you address your adversary's characterization of putting in applications as just ministerial? Is that so? No, it's not, Your Honor. So as the court previously noted, the two sets of hospital bylaws that are cited in the complaint, they cite possession of a New Jersey medical license as a threshold requirement, not as something that can be obtained after the fact. So in order to be in a position to submit those applications, he would need to first obtain a New Jersey medical license, which he has not done. And he has not alleged that there would be any adverse consequences to him in attempting successfully or not to obtain a New Jersey medical license. What he has done is claim that were he to apply for hospital privileges and be rejected that an adverse entry would be made in the National Practitioner's Data Bank. That's not so either. And we don't have to speculate about that because that database is created by federal statute. And we have cited the statute in our briefing. And it describes the sorts of events that are required by hospitals to be reported. And they relate to the status of physicians who already have privileges at a given hospital. There is no requirement that an unsuccessful application for employment be reported to the data bank. And again, we get this from the face of the statute. This is not speculation about what might happen were he to apply for employment. And finally, again, as he admitted previously, there are many hospitals that would grant privileges to a surgeon who was only board eligible and not yet certified. And we don't have any allegations about the universe of hospitals in northern New Jersey as a whole, and how many of them would grant privileges to a surgeon that was eligible. We only know about three hospitals whose, well, he cited the bylaws of two and made reference to a third one. Is, let's assume for the sake of discussion, we thought you were right and that standing was something we couldn't get past here. The district court dismissed this case and did it with prejudice. Typically, a dismissal for lack of standing on 12B1 is without prejudice. So wouldn't we have to send this back, even if we agreed with you and say, hey, this thing, the complaint was deficient, but it was deficient not in the way you're suggesting you never should have gotten to the merits, dismiss this without prejudice. Isn't that the logical end of your argument? Well, I think the dismissal should be with prejudice to the current facts. I suppose it's conceivable that the facts should change in the future. Well, wait a second. When you say with the present facts, we don't get to the merits at all under your theory, right? We just look at, he didn't apply for a license. He didn't apply for hospital privileges. Ergo, he didn't do the things he had to do to actually be in a position to case. Now you don't look any further than that to get to where you want to get, right? Correct, your honor. Okay. Then how could dismissal be for anything other than without prejudice, if that's the limit that we go to? Well, again, if I think dismissal would be, it is possible that the facts could change, that Dr. Ellison could take certain steps that would allow him to renew his complaint in the future. So yes, it's conceivable that he could remedy the standing effects at some future point. Although our brief sets forth numerous other dispositive failings in the complaint. And obviously we would prefer that to be closed permanently. Well, we know that, but we couldn't get to those if you're right about standing, right? I mean, if you're right, if you win on standing, we don't get to your merits arguments, do we? Not without just a whole bunch of dicta. That's probably correct, your honor. Okay. I noticed that your opponent references the dismissal under 12B6, whereas you've mentioned it under the dismissal as being under 12B1. Now the district court did not address the standing issue, but he addressed the failure to state a claim. And so I assume that's why we're talking about 12B6 here. Am I mischaracterizing the positions that both of you are taking here? We did in fact move on multiple bases, your honor. There also was a jurisdictional argument. A personal jurisdiction argument. Correct. But we did not purely rely on 12B6. Okay. Well, lest you, I understand your point is a practical matter that you'd like to see this with prejudice, but, and you did brief the jurisdictional issue. I think we would have that. That's our duty anyway, as you well know. So we appreciate your briefing there. Perhaps you can move on then to the agreement and some of the other things that I'm sure you want to talk about. Yes, absolutely, your honor. As the courts noted, there's no direct facts regarding an agreement between my client and any New Jersey hospital. There is an effort to imply that an agreement exists, but none of the allegations, again, concern my client or any New Jersey hospital. They concern two entities that are not parties to this litigation. The American Board of Medical Specialties, which is an umbrella board to which my client belongs, and the American Hospital Association, which Dr. Ellison alleges many hospitals belong to. There are no allegations that suggest that ABMS acts as my client's agent or that my client is in a position to dictate ABMS policy in this context, but more importantly- Well, wait a second though. It may be that ABOS can't dictate to ABMS, but can ABMS dictate to ABOS? Is it apparent? It cannot. Now, my assertion to that effect, I will acknowledge, is outside of the record, but there are no pleadings regarding that. And there is an amicus brief that was submitted by ABMS, which makes clear that if 24 member boards have different certification requirements, that there are some common themes among the 11 surgical boards, but that they do have discretion that their own policy. But beyond that, the allegations that are made regarding ABMS and the American Hospital Association, they don't actually establish an agreement here. There is, as was noted earlier, a reference to a press release announcing that some ABS member boards, not all of them, and it doesn't identify my client as being among them, would accept maintenance of certification credits from some AHA member hospitals that are participating in a specified program. Not clear if any of those hospitals are in New Jersey. But answer Mr. Schlafly's assertion that ABMS has said things that can rightly be attributed to ABOS because they're tightly related organizations, and that those statements, those public statements by ABMS, fairly looked at in the context of 12B6, where every inference is drawn in favor of the plaintiff, are intended to and would pressure hospitals. Now, I've put words in his mouth, but I take that to be his pitch, his argument. Well, the public statements that are attributed to ABMS, as recounted in the article Mr. Schlafly cites, they're in the nature of ABMS touting the value of the certification programs of its member boards to hospitals. There's nothing untoward about ABMS publicly noting the value of its member boards programs, and in fact, that sort of public advocacy... Now, if we look at it that way, are we giving the plaintiff every fair inference? The assertion I take it from Mr. Schlafly is that perhaps you could read the advertisement the way you suggested, but a fair inference is they're putting the hospitals on If you don't accept and you don't require our certifications, then you're opening yourself up to trouble, and we can make trouble for you. That's sort of the underlying thing I think we're getting from the plaintiff's side. What makes that an unfair inference, one that we should not accept, or we shouldn't take? Well, two points, Your Honor. Number one, I think this public advocacy tends to cut against the existence of a supposed agreement. I think public advocacy is a proper and appropriate tool. And number two, there simply is not any fact-leading that would support the conclusion that Mr. Schlafly urges. It's not clear what the nature of supposed pressure is. It's not clear, to borrow your phrasing, what sort of trouble ABMS or its member boards would create for hospitals. And it's not within the function of my client to do something like that. My client evaluates surgeons. The argument from Mr. Ellison is it's absolutely in your interest to do it. You're a money-making operation. You get money from certifying people. And by requiring more and more certifications, you make more and more money. It is a straight-up, old-school, pecuniary interest. That's the assertion. And I take it the assertion is likewise. It's not the crude kind of pressure of, you know, do this or we will kneecap you. It is a more subtle but real pressure that if you don't require certification, when look at all these other places that do require certification, you've got a low-class operation at your hospital and that opens you to liability issues should there be a problem because you're not taking the steps you need to have well-credentialed physicians treating the patients in your hospital. Now, again, I'm doing some extrapolating here. I probably haven't said it as well as Mr. Schlafly would say, but I take it that that's the argument that's being made. And so that's why I'm putting it to you. What's unfair about that set of inferences? Why is that a place we shouldn't go if we got to 12B6 instead of 12B1? Your Honor, that goes rather far outside that anything that's been articulated in the complaint. There simply are no allegations of ABMS, much less my client attempting to impose that pressure on any hospital. That cannot be found anywhere within the Mr. Schlafly did a rather extensive search of the public record of statements by ABMS and my client in drafting the complaint. It's simply not founded in reality. And one final point, because there is fairly extensive discussion in Mr. Schlafly's briefing describing my client as a money-making operation. That is wholly new on this appeal. His complaint and briefing below at no point impugned my client's nonprofit status. That is a fact allegation. It's also inaccurate, but it's being introduced improperly for the first time on this appeal. Okay, thanks. Do you want to say something about the tying argument? I suspect your adversary is going to mention that in reply, and perhaps you can anticipate some results. Yes, Your Honor. It's, as should be clear by now, my client is a participant in the market for only one of the certification. It's not a participant in the market for hospital employment opportunities, and it's not going to be. That is not market that it is attempting to force its way into. And in instances such as this, where a defendant offers only one of the purportedly tied products, federal circuits are virtually unanimous in at least requiring some sort of direct economic interest in the second product. We've seen this fairly definitively, I believe, in the 4th, 5th, 6th, 7th, 9th, 10th, and 11th circuits. And this court, in the Benzie case in 1975, also suggested that that was a better approach and has never stepped away from it at the circus level. And here, there are no allegations that my client has anything resembling a direct economic interest in hospital employment opportunities. It's not receiving rebates or premiums or anything of that nature. So we don't have a tying violation because we don't offer or have any relationships to the second product. And moreover, there really isn't a second product at issue at all, because there's no allegation that my client only accepts privileges at specified hospitals or hospitals with whom it has an arrangement, or for example, American Hospital Association member hospitals. Dr. Ellison is free to satisfy my client's requirements at any one of hundreds of competing hospitals, some of which are identified in his claim. So there are no fact leadings that support the notion that there's anti-competitive forcing occurring, that we are attempting to force him to procure a product that he would rather procure somewhere else. And in fact, this is a product that he acknowledges wishing to procure. So the tying allegations fundamentally fail here. Okay. Judge Jordan, do you have any other questions? And Judge Sirica? Okay, we thank you, counsel, and we'll hear from your adversary in reply. Thank you. Thank you, your honor. We had multiple amicus briefs filed in support of us in this case because the issues are so important. There is a restraint of trade here. Bruce Ellison and others like him are unable to get this board certification, and without this to the argument you heard Mr. Green make. Okay. He said, look, it's just not so that he can't take this. Factually, it's inaccurate to say he couldn't get provisional privileges. He can get provisional privileges, or he could have within that five-year window, and he still could do that. He'd have to take step one again because that window closed. But there's nothing about this. You're too far past your medical school graduation thing that makes him ineligible. He's just told us that's straight up the facts. How's he wrong? What's wrong with that? And Mr. Green is, respectfully, he's just wrong about that. And I looked again last night to see if the rules had changed at these New Jersey hospitals, and they have not changed. They only require board eligibility if you're within that roughly five-year period of residency. So Bruce when you say these New Jersey hospitals, the assertion is you've talked about three, and yet you've said a relevant market is the northern New Jersey hospitals, of which there are many, many, many. So you just haven't made your record. You haven't, by your own requirements under 12B6, pled that this can't be done in any more than a conclusory way, and referencing three that's what I understand Mr. Green to be saying. What's wrong with that argument? Your Honor, the flaw in that is there are not many, many hospital systems in northern New Jersey. I actually live in northern New Jersey. There are conglomerates. There are only a few hospital systems. There are many community hospitals, but they're all part of one or a few conglomerates that have the same rules and regulations that apply to all of them. And those rules are that you can only get on staff under this board eligibility criteria if you're within five or so years of your residency. So Mr. Ellison, Dr. Ellison cannot get on staff at these hospitals because he's outside of that window. Can he take part one again? Is that possible? Well, Mr. Green has represented that they would allow, ABOS would allow Dr. Ellison to take part one again. I accept that representation, but that doesn't get Dr. Ellison anywhere because he passed part one and he has to take part two, which is easier in order to get the board certification. So part one doesn't get him the board certification and doesn't get him the medical staff privileges. And I want to step back a minute and why is this monopolist allowed to erect all these hoops for people to jump through? Realize Dr. Ellison had performed numerous cases, surgeries at an ambulatory surgery center. He presented those to ABOS or he said, I have them to present. ABOS said, no, we don't accept surgeries done at ambulatory surgery centers. You have to have hospital medical staff privileges. Why do we allow a monopolist to impose that arbitrary condition clearly restrains trade and it disrupts. Now, Mr. Green is making all these factual assertions that we welcome well, if Dr. Ellison could, if he does this and this and this and this, and maybe he can get there. Well, first of all, that's, that's what we have discovery for. And I don't think it's, Oh, wait a second. When you say that's what we have discovery for. We're just like, we're, we're trying to stay just where you want us to stay, Mr. Schlafly, which is within the complaints. And he said that in the course of your pleadings in the second amended complaint, you acknowledged what he said is true. He says, if you look at the second version of their complaint, you'll see that they acknowledge that there's a window of opportunity for people who pass test part one to get provisional privileges and that you remove that from the next iteration of your complaint. Is that an accurate accounting of how this worked? Dr. Ellison's beyond that back and look at what an earlier version of the complaint said. Of course, I've amended that I'm allowed to amend my complaint. You are allowed to amend that, but, but you're not allowed to amend away or make disappear facts. If it is in fact the case, cause here's what I'm hearing. I'm hearing two different stories. Okay. I'm hearing from you. If you're past a certain window of your medical school graduation, you can never get provisional privileges period, which is a way saying that the ABOS in a, in an act of what might appear to be spectacular self-defeating behavior has said, we don't want anybody applying to us who's five years past medical school, but let's assume that we thought, okay, that's accurate. Okay. That's the way they're doing it. Cause that wouldn't just hit Dr. Ellison. That would hit everybody past a certain window. Right. But let's assume that that were the case, uh, that, uh, that's what you pled. What I'm hearing from Mr. Green is yeah. But in an earlier version, they admitted that's not true. What is true is you've got five years after you pass step one, you pass step one, you got your five years within which to get your provisional privileges and applied, take step two. That's what I'm hearing him say. And I'm hearing him say that that was acknowledged at one point in the course of your pleadings. So that's why I'm asking you, was that acknowledged at some point, or is that just not true? That is not an accurate representation of what we pled earlier in this case. Of course, we've amended it. It's certainly not true with respect to Dr. Ellison and other physicians in his position. Well, why wouldn't it be? Let's, let's assume for the sake of discussion that if we read that series of the many complaints, we thought, you know what? It does look like they've acknowledged that there's a five year window after taking step one, not, not medical degree granting as the start, but after passing step one, if we thought that that in fact had been said, and we accepted that as, as true, doesn't that cause a serious problem for you and your standing argument? The fact that he let that window close and didn't, didn't apply for privileges doesn't mean he didn't have the window, right? The window your honor is after the residency. Now, I'm not aware of any window after passing part one of the exam. I've never seen that in the hospital regulations. The, the window is five years after you complete a residency and Dr. Ellison's passed that as other physicians are too. And most physicians are, are herded through that five year period to, to get, you know, to, to comply with these arbitrary requirements. And that's how most physicians get in. But if there are many physicians who, for whatever reason, maybe they go on extended missionary work or trips, or maybe they have family commitments or whatever, and they get outside that window and ABOS says, no, we're not going to, well, it's hospitals, it's hospitals that say, no, we're not going to allow you on staff unless you get board certification from ABOS specifically, not from another board certifying group, but from ABOS. And then so he goes to ABOS and ABOS says, we're not going to give it to you unless you're on staff at a hospital. Why doesn't ABOS accept ambulatory surgery centers? Well, this is, this is sort of the plus factor under Twombly where we've got this monopolist that's acting in a kind of a unusual way where it's actually denying a customer. It's denying people the ability to buy their product. And why is it doing that? Well, it's doing that because it's helpful to hospitals. ABOS is helping hospitals by saying, we're only going to accept your privileges. We're not going to accept privileges in ambulatory surgery center. So that's sort of the plus factor. And I ask, I mean, what more could be expected of a plaintiff who is challenging a sophisticated monopolist? Judge Sirica, you wrote the in-ray insurance brokerage litigation decisions been widely cited, by the way, more than 1200 cases have cited that favorably. And you reversed in that case, some of the 12B6 dismissals of a Sherman Act claim. And you can't expect a plaintiff to have an actual agreement at the pleading stage in this day and age with the sophisticated restraints of trade, they're going on to increase revenue, just as you'd expect monopolists to do. You can't expect me to have all the evidence to begin and judge Sirica, you said right in that case, a plaintiff is not expected to plead evidence. I plead what I can. And what we're asking is simply to get to discovery. It's not going to be abusive discovery. This isn't Twombly where it was a massive class action against phone companies and complicated case. This is one doctor who's trying to get to the bottom of this and he pled what he could. He's locked out. I mean, that's not, you know, there's no doubt about that. I mean, he's locked out. Well, there actually is a doubt about that, which is why we're arguing this case, right? I think we got your argument. Right. Well, I think we were. Thank you for your argument, counsel. I asked counsel if they could get a transcript of this. You can work with the clerk. We covered a lot of ground in this argument. And you can touch base with the clerk's office. We'd ask that the parties split the cost of a transcript of this argument. But again, Mr. Kane can help you out. But we wanted to thank counsel for their excellent oral arguments and all their excellent briefing in this interesting case. We wish you well. And thank you again for sharing your morning with us. And if I could just say, Judge, you're exactly right about the standing and it has to be without prejudice. I just wanted to say that you're exactly right. If it's if it's on the standing grounds, it has to be without prejudice. I'm sorry. Thank you. Thank you. All right. Thank you. Thank you, everybody. Well, thank you.